IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

```
JAMES DAMION MACK,            )
                              )
           Plaintiff,         )
                              )
    v.                        )          1:24CV605
                              )
MR. HACKETT,                  )
                              )
           Defendant.         )
```

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States Magistrate Judge for a recommendation on the Motion for Summary Judgment (the "Summary Judgment Motion") of Defendant Mr. Hackett ("Defendant Hackett"). (Docket Entry 17; see also Docket Entry 18 (Memorandum in Support).) For the reasons that follow, the undersigned will recommend that the Court grant the Summary Judgment Motion.

**I. PROCEDURAL HISTORY**

Plaintiff, a former state inmate proceeding pro se, filed an unverified Complaint alleging claims under 42 U.S.C. § 1983 ("Section 1983") of religious discrimination in violation of the First and Fourteenth Amendments to the United States Constitution that allegedly occurred while Plaintiff served a sentence in state prison. (See Docket Entry 2.) Plaintiff brought those claims against Defendant Hackett, the Chaplain at Piedmont Correctional

Institution ("PCI"), in his individual capacity. (See id. at 2.)[1] After Defendant Hackett filed his Answer (Docket Entry 12), the Court permitted the parties a period of discovery (see, e.g., Docket Entry dated Jan. 28, 2025). At the end of discovery, Defendant Hackett filed the Summary Judgment Motion and Memorandum in Support, arguing that (1) "[Plaintiff] cannot show that [Defendant] Hackett treated other inmates differently than [Plaintiff]" under the Fourteenth Amendment's Equal Protection Clause (Docket Entry 18 at 5), (2) "[Defendant] Hackett's actions did not present a substantial burden upon Plaintiff's ability to freely exercise his religion" under the First Amendment's Free Exercise Clause (id.), and (3) "[Defendant] Hackett is [] entitled to qualified immunity" (id.).

Along with the Summary Judgment Motion and Memorandum in Support, Defendant Hackett filed the Declaration of Dr. Jason Hackett (Docket Entry 18-1) which, in turn, relies upon the following documents: (1) North Carolina Department of Adult Correction ("DAC"), Division of Institutions ("DOI") Religious Services Policy and Procedure (Docket Entry 18-2), (2) PCI Chaplaincy Service Standard Operating Procedure ("SOP") (Docket Entry 18-3), (3) DAC/DOI Diagnostic Centers Policy and Procedure

---

[1] Pin cites to Docket Entries refer to the page numbers that appear in the footer appended thereto upon docketing in the CM/ECF system (not any original pagination).

(Docket Entry 18-4), (4) DAC/DOI Offender Custody Classification Policy and Procedure (Docket Entry 18-5), (5) DAC Offender Public Information regarding Plaintiff (Docket Entry 18-6), and (6) print-out reflecting Plaintiff's custody actions during incarceration (Docket Entry 18-7). The Clerk sent Plaintiff a letter in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the Summary Judgment Motion. (Docket Entry 19.) Despite that notice, Plaintiff failed to respond to the Summary Judgment Motion. (See Docket Entries dated June 26, 2025, to present.)

## II. STATEMENT OF FACTS

In the Complaint, Plaintiff asserted that "[Defendant] Hackett was allowing the Christian processer's [sic] to attend their religious services (Bible Study) while at the same time denying the Muslim processer's [sic] attendance to their religious services (Talim, Jumu'ah), which happens to be obligatory in [Plaintiff's] religion." (Docket Entry 2 at 5; see also id. at 11 (notarizing allegations of Complaint as sworn by Plaintiff).) The Complaint further maintains that the alleged discrimination "involved [him]self and several other Muslims . . . and the entire facility was aware of the situation." (Id.) According to Plaintiff's allegations in the Complaint, "[he] asked [O]fficer Fuller and [O]fficer Taylor to check and see if [Plaintiff and other, unnamed individuals] could attend Jumu'ah services Friday 3/25/22 and

-3-

[Officers Fuller and Taylor] asked their sergant [sic] on duty" and then "told [Plaintiff] that their sergant [sic] called the chaplain and . . . the chaplain said that [Plaintiff and unnamed others] couldn't attend because [they] were processer's [sic]." (Id.) The Complaint therefore asserts that Defendant Hackett "continuously and knowingly discriminated against [Plaintiff's] religion, while denying [him] the right to exercise [his] religious freedom" (id.) in violation of the "First and Fourteenth Amendments" (id. at 3), entitling him to "$450,000" in "punitive damages" (id. at 5).

Plaintiff attached to his Complaint a sign-up sheet for "Life Recovery Bible Study [i]n the Chapel" on April 12 and 13, 2022, reflecting the names "Mark Wonderly," "Michael Cole," and "Joseph Carson" (id. at 15), as well as a list of "Attendees for Life Recovery Bible Study in the Chapel" on April 12, 2022, which contains 18 names, including "Mark Wonderly" but neither "Michael Cole" nor "Joseph Carson" (id. at 16). Lastly, Plaintiff attached to his Complaint a handwritten list of dates from November 1, 2021 to April 15, 2022, without accompanying explanation of the relevance of those dates. (See id. at 18.)[2]

---

[2] The Complaint alleges that Plaintiff exhausted his administrative remedies under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), by filing a grievance and "appeal[ing] the grievance to step three and complet[ing] the process." (Docket Entry 2 at 7; see also id. at 12-14, 17 (grievance and responses).) Defendant Hackett, in his Answer, "admit[ted] that Plaintiff ha[d] submitted grievances with the facility related to an alleged event that transpired at [PCI] on March 25, 2022, and that Plaintiff appealed th[at] grievance to the 'third step' with the Inmate Grievance Resolution Board"
(continued...)

In his Declaration, Defendant Hackett averred that, during the time relevant to this action, he served as "a clinical chaplain at [PCI]" and "provide[d] compassionate, individualized spiritual care to [] people in the custody of the [DAC]." (Docket Entry 18-1, ¶ 3.) In that capacity, he "provide[d] teaching and counseling that prepare[d] individuals both spiritually and emotionally for life beyond the facility walls" and "coordinate[d] and le[d] religious services for diverse faith groups." (Id.) Defendant Hackett further averred that he had "familiar[ty] with the religious policies of the [DAC] and the [SOPs] related to religious services at [PCI]." (Id.)

Defendant Hackett thereafter explained that "[t]he [DAC] Policy on Religious Services . . . provides that religious services may be provided for regular population offenders" (id., ¶ 5), and that "the policy allows for all offenders to 'privately pray, meditate, and study scriptures or religious literature in their cell'" (id. (quoting Docket Entry 18-2 at 6)). According to Defendant Hackett, "[t]he [PCI SOP] on Chaplaincy Services provides that religious programs may be made available to offenders in the regular prison population who are in medium or minimum custody" (id., ¶ 6), and "include activities such as Bible studies, Islamic

---

²(...continued)
(Docket Entry 12 at 2-3), and did not plead failure to exhaust administrative remedies as an affirmative defense (see id. at 3-5).

education, Jumah, Mass, and American Indian prayer circle, among others" (id. (citing Docket Entry 18-3 at 7-9)).

Additionally, Defendant Hackett averred that "[PCI] is one of several diagnostic centers operated by the [DAC]" (id., ¶ 7), that "[n]ew and returning offenders in the custody of the [DAC]," "colloquially called 'processors,'" must "complete several processes upon their admission to the facility" (id.), which "broadly include a reception period, offender orientation, and several diagnostic evaluations . . . 'to assist the individual in adjusting to incarceration and to provide evaluative information for management and treatment of the offender'" (id. (quoting Docket Entry 18-4 at 1)). Defendant Hackett further explained that "[p]rocessors are not yet part of the regular prison population until they have completed their processing" and that, "[f]or safety and management reasons, processors are not permitted to take part in the regularly scheduled religious activities [at PCI] until they have fully processed into the facility and received a custody designation" (id., ¶ 8 (citing Docket Entry 18-5)), but "may submit a request to observe religious practices to [PCI's] warden, in consultation with the chaplain" (id., ¶ 9 (citing Docket Entry 18-2 at 2-3)).

With regard to Plaintiff's allegations in the Complaint, Defendant Hackett noted that Plaintiff "was most recently incarcerated on March 10, 2022, after convictions for interfering

-6-

Case 1:24-cv-00605-TDS-LPA   Document 20   Filed 02/18/26   Page 6 of 20

with a monitoring device and being a habitual felon[ and ] was released on probation on December 2, 2024." (Id., ¶ 10 (citing Docket Entry 18-5 at 1).) Defendant Hackett pointed out that, "[a]s with other newly admitted offenders, [Plaintiff] was required to complete processing before he could be admitted into the regular prison population" (id., ¶ 11), as well as that "[Plaintiff] completed processing and received his initial custody classification on March 30, 2022[, and thus] was a processor for twenty days" (id. (citing Docket Entry 18-7 at 1)). Defendant Hackett averred that, "[d]uring the time in which [Plaintiff] was processing into [PCI], he was not permitted to attend corporate worship services per policy[, which] held true for those of all faiths, Christian and Muslim alike" (id., ¶ 12), and that, "[a]fter he had completed processing, [he] was permitted to attend[] and did attend Islamic services" (id., ¶ 14). Defendant Hackett lastly observed that, "[w]hile processing, [Plaintiff] did not submit a special request to the warden to observe a particular religious practice" (id., ¶ 13), and "never discussed any issues related to accessing religious services with [Defendant Hackett]" (id., ¶ 15).

### III. ANALYSIS

#### A. Summary Judgment Standard

The Court should grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant

-7-

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In determining whether a genuine issue of material fact exists, . . . the evidence [must be viewed] in the light most favorable to the nonmoving party. However, a nonmovant cannot defeat summary judgment with merely a scintilla of evidence." American Arms Int'l v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009) (citation omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted). The party seeking summary judgment has the initial burden to show "an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Additionally, even for unopposed summary judgment motions, the moving party must establish "that it is entitled to a judgment as a matter of law." Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993) (internal quotation marks omitted).

In this case, Plaintiff failed to respond to the Summary Judgment Motion (see Docket Entries dated June 26, 2025, to present), despite notice to do so (see Docket Entry 19). However, Plaintiff's "verified [C]omplaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." Williams v.

-8-

Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (emphasis omitted).[3] The undersigned United States Magistrate Judge will therefore consider the verified allegations in the Complaint in resolving the Summary Judgment Motion.

**B. The Qualified Immunity Defense**

"Section 1983 . . . creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States." Cooper v. Sheehan, 735 F.3d 153, 158 (4th Cir. 2013). However, "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" Brown v. Gilmore, 278 F.3d 362, 366-67 (4th Cir. 2002) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). "The Supreme Court has directed that 'qualified immunity questions should be resolved at the earliest possible stage of a litigation.'" Smith v. Reddy, 101 F.3d 351, 357 (4th Cir. 1996) (quoting Anderson v. Creighton, 483

---

[3] Even for unopposed summary judgment motions, the moving party must establish "that it is entitled to a judgment as a matter of law." Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993) (internal quotation marks omitted).

U.S. 635, 646 n.6 (1987)). In analyzing qualified immunity, the Court must consider (1) "whether a constitutional violation occurred," and (2) "whether the right violated was 'clearly established' at the time of the official's conduct." <u>Williams v. Ozmint</u>, 716 F.3d 801, 805 (4th Cir. 2013). The Court possesses discretion to address either prong first. <u>See</u> <u>Henry v. Purnell</u>, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). For the reasons that follow, the record, viewed in the light most favorable to Plaintiff, fails to support a finding that Defendant Hackett violated Plaintiff's constitutional rights and, thus, qualified immunity bars both of Plaintiff's individual-capacity claims against Defendant Hackett.

1.  <u>First Amendment Free Exercise Claim</u>

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]," U.S. Const. amend. I, and "[i]nmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion," <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 348 (1987) (citation omitted).[4] To establish a "violation of rights secured by the Free Exercise Clause, an inmate . . . must demonstrate that: (1) he holds a sincere religious belief; and (2) a prison practice

---

[4] The Supreme Court has applied the First Amendment to the states through the Fourteenth Amendment. <u>See</u> <u>Everson v. Board of Educ.</u>, 330 U.S. 1, 15 (1947).

-10-

or policy places a substantial burden on his ability to practice his religion." Carter v. Fleming, 879 F.3d 132, 139 (4th Cir. 2018). Moreover, even if an inmate can show that a prison policy substantially burdens his religious exercise, the policy will not violate the First Amendment if the defendant can demonstrate that the policy "reasonably related to legitimate penological interests," Turner v. Safley, 482 U.S. 78, 89 (1987); see also id. at 89-90 (setting forth four-factor reasonableness inquiry, including (1) whether penological objective justifying prison policy qualifies as "legitimate and neutral," and whether "a valid, rational connection [exists] between the prison [policy] and the legitimate [penologic]al interest," (2) "whether . . . alternative means of exercising the right [exist] that remain open to prison inmates," (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources," and (4) whether "ready alternatives" exist to prison's policy).

Here, Defendant Hackett declined to question the "sincerity of Plaintiff's beliefs," but did contend that the prison policy that prohibited Plaintiff, during the brief, 20-day period during which he underwent processing, from attending scheduled religious services with the regular prison population did not place "a substantial burden . . . on his ability to practice his religion." (Docket Entry 18 at 7.) In that regard, Defendant Hackett notes

-11-

that "[o]ther courts have held that a prison's action which may temporarily cause inmates to miss religious services does not substantially burden an inmate's rights under the First Amendment." (Id. at 8 (citing Craig v. Sevier, No. 1:24CV1329, 2025 WL 1222461, at *2 (S.D. Ind. Apr. 28, 2025) (unpublished), Beebe v. Birkett, 749 F. Supp. 2d 580, 597 (E.D. Mich. 2010), and Boomer v. Irvin, 963 F. Supp. 227, 231 (W.D.N.Y. 1997)).) Defendant Hackett further argues that "[he] had a legitimate penological interest in promoting safety and effective prison management that was rationally related to keeping Plaintiff from attending religious services with other inmates until he had fully processed into the facility." (Id. at 9 (internal citation omitted).)

Assuming the sincerity of Plaintiff's religious beliefs, his First Amendment claim fails because he cannot show that missing one Jumu'ah service on March 25, 2022, while he remained a processor substantially burdened his ability to practice his religion. "[S]ingle or isolated incidents do not place a substantial burden on an inmate's exercise of religion." Davis v. Doe, No. 1:14CV373, 2014 WL 1835853, at *2 (M.D.N.C. May 8, 2014) (unpublished) (rejecting inmate's First Amendment Free Exercise claim where prison policy "caused him to miss part of a single religious service"); see also Bynum v. Poole, No. 1:15CV960, 2017 WL 3578698, at *4 (M.D.N.C. Aug. 17, 2017) (unpublished) (Webster, M.J.) (declining relief on inmate's Free Exercise claim based on

-12-

cancellation of Jumah service on one occasion, and holding that "the Court w[ould] not view a single or isolated incident as placing a substantial burden upon [the p]laintiff's exercise of religion" (internal quotation marks and brackets omitted)), recommendation adopted, slip op. (M.D.N.C. Sept. 18, 2017) (Biggs, J.). Indeed, federal district courts across the country consistently have found singular or brief incidents did not substantially burden an inmate's free exercise of his religion. See Craig, 2025 WL 1222461, at *2 ("[W]ithout more, an allegation that a prison official prevented participation in a religious service on one occasion is not sufficient to allege a substantial burden."); Pfeil v. Lampert, 11 F. Supp. 3d 1099, 1111 (D. Wyo. 2014) (rejecting contention that single missed visit with minister constituted substantial burden); Mubashshir v. Moore, No. 3:10CV2802, 2011 WL 1496670, at *6 (N.D. Ohio Apr. 19, 2011) (unpublished) (concluding that inmates' "First Amendment rights were not violated," because denying them "services in the chapel on two occasions" qualified as "isolated instances," and collecting cases to support proposition that "[i]solated acts or omissions . . . do not constitute a substantial burden on religious freedom"); Gunn v. Kentucky Dep't of Corr., No. 5:07CVP103, 2010 WL 2555756, at *5 (W.D. Ky. June 18, 2010) ("[T]he isolated incident [the p]laintiff describes [of missing one religious service due to prison policy] is not sufficient to implicate the Constitution.");

-13-

Gill v. Defrank, No. 98 CIV. 7851, 2000 WL 897152, at *2 (S.D.N.Y. July 6, 2000) ("[M]issing one religious service does not constitute a substantial burden on an inmate's right to the free exercise of his religion."), aff'd, 8 F. App'x 35 (2d Cir. 2001).

Alternatively, even assuming, arguendo, that Defendant Hackett's denial of permission for Plaintiff to attend one group religious service on March 25, 2022, substantially burdened his right to free exercise of his religion, Defendant Hackett has convincingly shown that he acted pursuant to a prison policy which rationally related to a legitimate penological interest in maintaining safety and order in the prison. Under the first Turner factor, i.e., "legitma[cy] and neutral[ity]," Turner, 482 U.S. at 89, Defendant Hackett's proffered penological objective of "promoting safety and effective prison management" (Docket Entry 18 at 9) certainly qualifies as legitimate and neutral, see In re Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 469 (4th Cir. 1999) ("In the difficult and dangerous business of running a prison, frontline officials are best positioned to foresee threats to order and to fashion responses to those threats. Hence, the evaluation of penological objectives is committed to the considered judgment of prison administrators, who are actually charged with and trained in the running of the particular institution under examination. When a state correctional institution is involved, the deference of a

-14-

federal court is even more appropriate. Prison officials should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."), abrog'n on other grounds recog'd, Latson v. Clarke, 794 F. App'x 266, 270 (4th Cir. 2019).[5]

Moreover, "a valid, rational connection," Turner, 482 U.S. at 89 (internal quotation marks omitted), exists between the legitimate and neutral penological objective of prison safety and effective prison management and the prison policy in question. The DAC/DOI Diagnostic Center Policy and Procedure details that processing an inmate involves, among other things, collecting social, mental health, and criminal history information, conducting a psychological evaluation, administering psychometric tests, identifying Security Risk Group, i.e., gang, affiliations and other crime-related problems, and administering a Risk Needs Assessment. (See Docket Entry 18-4 at 2.) Thus, the policy of prohibiting all processors from participating in group religious services with the regular prison population until prison officials complete these critical assessments that determine an offender's custody classification rationally serves the legitimate penological

---

[5] Similarly, the "prison [policy] restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression," Turner, 482 U.S. at 90, as it applied to processors "of all faiths, Christian and Muslim alike" (Docket Entry 18-1, ¶ 12).

-15-

objective of maintaining prison safety and effective prison management. The first Turner factor therefore strongly weighs in Defendant Hackett's favor.

Next, the Court must consider "whether . . . alternative means of exercising the right [exist] that remain open to prison inmates," Turner, 482 U.S. at 90. As detailed above, notwithstanding the policy in question temporarily prohibiting Plaintiff during processing from attending group religious services with the regular prison population, he retained the rights to 1) "'privately pray, meditate, and study scriptures or religious literature in [his] cell'" (Docket Entry 18-1, ¶ 5 (quoting Docket Entry 18-2 at 6)), and 2) "submit a request to observe religious practices to [PCI's] warden, in consultation with the chaplain" (id., ¶ 9 (citing Docket Entry 18-2 at 2-3)), the latter of which Plaintiff did not do (see id., ¶ 13). Thus, the second Turner factor clearly supports Defendant Hackett.

Under the third Turner factor, the Court evaluates the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources," Turner, 482 U.S. at 90. In this case, allowing inmates who lack a custody classification because they remain in processing to attend group religious services with the regular prison population would pose an obvious threat to both the prison guards and to other inmates. The guards and regular prison population

would face potential exposure at group religious services to inmates with gang (or other risk group) affiliation, serious mental health issues, or a history of (or propensity towards) retaliatory or violent behavior.  As such, this factor demonstrably favors Defendant Hackett.

The fourth Turner factor tasks the Court with assessing the existence of "ready alternatives" to the prison's processing policy, Turner, 482 U.S. at 90.  Here, both the sheer importance of the processing period to prison security and its brevity do not suggest that other such "ready alternatives" exist, and Plaintiff has proffered no evidence of such alternatives.  Accordingly, this factor definitively disfavors Plaintiff.

In totality, consideration of the Turner factors demonstrates that, even if the processing policy substantially burdened Plaintiff's right to practice his religion (which it did not, for the reasons explained above), Defendant Hackett has shown that he followed a policy that rationally related to the legitimate and neutral penological objective of maintaining prison safety and effective prison management.

Put simply, Plaintiff's First Amendment Free Exercise Clause claim fails as a matter of law.

2.   Fourteenth Amendment Equal Protection Claim

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its

jurisdiction the equal protection of the laws[.]'" City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985) (quoting U.S. Const. amend. XIV, § 1). Thus, "[t]he Equal Protection Clause . . . requires Plaintiff to show that Defendant Hackett "treated [Plaintiff] differently than [Defendant Hackett] treated similarly situated prisoners and that such unequal treatment resulted from intentional or purposeful discrimination." Miles v. Guice, 688 F. App'x 177, 179 (4th Cir. 2017) (citing Veney v. Wyche, 293 F.3d 726, 730-31 (4th Cir. 2002)). In this case, Plaintiff has not established an Equal Protection violation, because he has shown neither that Defendant Hackett treated other similarly situated inmates differently from Plaintiff, nor that such unequal treatment resulted from intentional religious discrimination.

With regards to different treatment from similarly situated inmates, as Defendant Hackett argues, the record does not support a reasonable inference "that the suspected Christian inmates whose names appear on the Bible study sign-up sheet provided in [the] Complaint were processors at the time of their inclusion [on the sheet] and not inmates who were part of the regular prison population." (Docket Entry 18 at 6.) Indeed, Defendant Hackett deemed it "telling that two names appearing on the hand-written sign-up sheet, Michael Cole and Joseph Carson, do not appear on the typed version of the list containing more names." (Id.

-18-

(referencing Docket Entry 2 at 15-16).)  As discussed above, Plaintiff failed to respond to the Summary Judgment Motion and thus did not refute any of Defendant Hackett's arguments and averments. As such, Plaintiff has not shown that Defendant Hackett treated Plaintiff differently from similarly situated inmates.

Concerning intentional religious discrimination, Defendant Hackett averred that "[he] respects all offenders, regardless of their beliefs or religious affiliations, and treat[s] all offenders with dignity and fairness" (Docket Entry 18-1, ¶ 4), as well as that the processing policy "held true for those of all faiths, Christian and Muslim alike" (id., ¶ 12).  Plaintiff did not refute those averments and thus has not raised any inference of intentional religious discrimination by Defendant Hackett.

In short, Plaintiff's Fourteenth Amendment Equal Protection Claim also fails as a matter of law.

## IV. CONCLUSION

Because Plaintiff has failed to establish that Defendant Hackett violated Plaintiff's constitutional rights, Defendant Hackett has demonstrated entitlement to qualified immunity regarding both of Plaintiff's claims under Section 1983 in this action.

**IT IS THEREFORE RECOMMENDED** that the Summary Judgment Motion (Docket Entry 17) be granted.

                                                         /s/ L. Patrick Auld
                                                             **L. Patrick Auld**
                                          **United States Magistrate Judge**

February 18, 2026